IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **CHERIE MARIE TODD,** | Case No. 3:17 CV 1500 |
| Plaintiff, | Judge Jeffrey J. Helmick |
| v. | Magistrate Judge James R. Knepp, II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | REPORT AND RECOMMENDATION |

## INTRODUCTION

Plaintiff Cherie Marie Todd ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated July 17, 2017). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI in May 2014, alleging a disability onset date of December 1, 2009. (Tr. 217-20).[1] Her claims were denied initially and upon reconsideration. (Tr. 146, 156). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 161). Plaintiff

---

1. Plaintiff previously filed two applications for SSI, each of which was denied. *See* Tr. 10, 83. In the most recent decision in March 2012, an ALJ concluded Plaintiff was capable of a range of sedentary work and thus denied her June 2010 application. (Tr. 83-94). The prior ALJ found Plaintiff was not disabled through the date of her decision, March 6, 2012. (Tr. 94).

(represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 16, 2015. (Tr. 34-71). On April 15, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 10-26). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on July 17, 2017. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in November 1971, making her 38 years old at her alleged onset date and 42 years old on the date her application was filed. *See* Tr. 24-25; 217.[2] She alleged disability based on back and elbow problems, degenerative disc disease, carpal tunnel syndrome, diabetes, peripheral neuropathy, asthma, depression, high blood pressure, and high cholesterol. (Tr. 241). Plaintiff had past work as a packager. *See* Tr. 24.

*Function Report*

In June 2014, Plaintiff completed a function report for the Social Security Administration. (Tr. 263-71). For her daily activities, Plaintiff described making coffee, letting her dogs out, sitting down to watch television, taking medication, thinking about whether she needs to go anywhere, and calling her mother. (Tr. 265). She prepared simple meals, and did household chores such as

---

2. An SSI claimant must establish disability during the pendency of her SSI application. *See* 20 C.F.R. §§ 416.330, 416.335. The relevant time period here is thus May 12, 2014 (the date of Plaintiff's application) through April 15, 2016 (the date of the ALJ's decision). *See* Tr. 10, 217. The undersigned also briefly summarizes some medical evidence prior to Plaintiff's application date to the extent it bears on her allegations of disability during the relevant time period. *See* *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006) ("We recognize that evidence presented at an earlier hearing or predating the onset of disability, when evaluated in combination with later evidence, may help establish disability.").

laundry, sweeping, and washing dishes, though she sometimes needed help. (Tr. 266). She shopped for groceries with someone else present, and rode in a motorized cart. (Tr. 267).

*Testimony*

At the time of the hearing, Plaintiff lived alone, but her sister lived in the same building (Tr. 45). Plaintiff had a driver's license and had no difficulties driving. (Tr. 46). She had a high school education, *id.*, and could prepare simple meals (Tr. 44-45).

Since the prior ALJ decision, Plaintiff had a 35-pound tumor removed, and her diabetes and back pain worsened; she had bursitis in her knees, tendonitis in her left elbow, and a hernia in her intestine. (Tr. 42). Since the tumor removal, and due to her hernia, Plaintiff could not lift more than five to ten pounds. (Tr. 44-45).

As a result of diabetes, Plaintiff felt sweaty and lightheaded when her blood sugar was low. (Tr. 45). This happened once or twice per month. *Id.* When her blood sugar was high, she would sweat and feel fatigued. *Id.* This happened about twice per week. *Id.* Plaintiff tested her blood sugar once per day (Tr. 45, 59), rather than the at least twice per day recommended by her physician because she forgets (Tr. 59-60).

Plaintiff testified her feet were numb most of the time, and had been for four to five years. (Tr. 46). She also experienced lower back and hip pain for about six years. *Id.* Her hip "ke[pt] popping out." *Id.* Plaintiff saw a chiropractor, "but every time he put[] it in [she could] step off the table and it pop[ped] right back out." (Tr. 46-47). She testified a physician told her she needed surgery. (Tr. 47). Plaintiff's knees hurt most of the time, especially with stairs. *Id.* Her knee would give out approximately once per week when standing from a seated position. *Id.*

Plaintiff estimated she could walk no more than a block. (Tr. 49). She could stand for no more than twenty minutes due to her back, legs, and stomach. *Id.* She could sit for an hour or two

3

before needing to move around or lay down. *Id.* She could bend over and touch her knees while standing, but could not touch the floor. (Tr. 49-50). Plaintiff's house had two flights of stairs, but she did not go up and down the stairs often. (Tr. 50). Plaintiff spent most of her days sitting or lying down. (Tr. 54). She slept for three to four hours during the day. (Tr. 55).

Plaintiff testified reaching overhead was problematic with her left hand. (Tr. 51). She also had pain and numbness in both hands, which became numb after about five minutes of writing. *Id.* Plaintiff had surgery on both hands due to carpal tunnel, but never had rehabilitation on her left hand "so it[] [was] mainly numb most of the time." *Id.* For pain, Plaintiff primarily took Ibuprofen 800. (Tr. 52-53). Gabapentin helped "somewhat" with the neuropathy. (Tr. 54).

Plaintiff grocery shopped with her mom or sister, sitting in an electric cart. (Tr. 56). For entertainment, she watched television and movies. *Id.* She used social media once or twice per week, either on library computers or on a relative's phone. (Tr. 57).

Plaintiff smoked about a pack-and-a-half of cigarettes per day. (Tr. 58). She also testified that she rolled her own cigarettes with her mother and sister. (Tr. 59).

Relevant Medical Evidence[3]

*Prior to Application Date*

Plaintiff saw a chiropractor at Family Chiropractic Center in March 2014, reporting lifting and twisting at home aggravated her lower back. (Tr. 413). After treatment, Plaintiff had increased range of motion and decreased muscle spasm. *Id.*

---

3. Although Plaintiff initially alleged disability based on both physical and mental impairments, *see* Tr. 241, in this appeal she only challenges the ALJ's evaluation of her physical symptoms, *see* Doc. 13, at 16 ("[t]he physical residual capacity determination is unsupported by substantial evidence"). As such, the undersigned limits review of the record to Plaintiff's physical impairments.

Plaintiff saw primary care provider Samer Obri, M.D., in April 2014 for diabetes and hyperlipidemia. (Tr. 509). Her hyperlipidemia was under control. *Id.* She reported diabetes symptoms of extremity pain and numbness, polydipsia, polyuria, fatigue, irritability, weight loss, sweating, polyphagia, nocturia, and dyspnea. *Id.* Dr. Obri noted poor compliance with treatment and poor symptom control and Plaintiff's HbA1c[4] was 8.7%. *Id.*; *see also* Tr. 519. On examination, Dr. Obri noted Plaintiff's toes were swollen and she had diminished vibratory sensation and position sense in her toes. (Tr. 513). She also had diminished tactile sensation throughout both feet. *Id.* She had a normal gait. *Id.* Dr. Obri diagnosed uncontrolled diabetes, hyperlipidemia, and diabetic peripheral neuropathy. (Tr. 513-14). He prescribed medication, recommended a diet and exercise program, and smoking cessation. *Id.*

*Subsequent to Application Date*

At a visit with Dr. Obri the following month, Plaintiff reported abdominal and back pain. (Tr. 501). Dr. Obri noted Plaintiff had previously had a large ovarian tumor removed; the surgery was complicated by infection. *Id.* Plaintiff had a normal gait, and no mobility limitations. (Tr. 506). Her lumbosacral spine had decreased lordosis, bilateral muscle spasms, and her flexion was painful and 90 percent restricted. *Id.* He again noted similar findings as previously about sensation in

---

4. "HbA1c, also referred to as glycated hemoglobin, is an important blood test used to determine how well an individual's diabetes is being controlled." *McDaniel v. Astrue*, 2011 WL 1196775, at *3 (E.D. Tenn.), *report and recommendation adopted* by 2011 WL 1154494 (citing WebMD: The Hemoglobin A1c (HbA1c) Test for Diabetes, Reviewed by John A. Seibel, MD on March 08, 2009 (http:// diabetes.webmd.com/guide/glycated-hemoglobin-test-hba1c) (last accessed 10/31/2010) (citing American Diabetes Association: "A1 C Test." Droumaguet, C., Diabetes Care, 2006, 29:1619; Steffes, M., Clin Chem, 2005, 51:1569; Selvin, E., Diabetes Care, 2006; 29:877)). "For people without diabetes, the normal range for the hemoglobin A 1c test is between 4% and 6%. Because studies have repeatedly shown that out-of-control diabetes results in complications from the disease, the goal for people with diabetes is an hemoglobin A 1c less than 7%. The higher the hemoglobin A1c, the higher the risks of developing complications related to diabetes." *Id.* (internal quotations omitted).

Plaintiff's feet and toes. *Id.* Dr. Obri assessed lower back pain and prescribed Ibuprofen 800. (Tr. 508). Lumbar spine imaging showed disc narrowing at L3-L4, L4-L5, and L5-S1. (Tr. 458).

Later that month, a CT scan revealed a 5.6 cm "ventral mid abdominal wall defect with a small amount of herniated colon, which [did] not appear to be obstructive" and a "3.3 cm abdominal wall defect with a small amount of herniated small bowel, again without proximal dilatation." (Tr. 497-98). On examination, Dr. Obri noted tenderness in Plaintiff's left upper and lower abdominal quadrants. (Tr. 498). She also had similar lumbar spine findings and feet/toe sensation findings as the prior visit, as well as a normal gait and no mobility limitations. (Tr. 498-99). Dr. Obri's plan for Plaintiff's lower back pain included heat and ice. (Tr. 499). She was referred to surgery for her hernia. *Id.*

At an appointment regarding her diabetes and hernia in June 2014, Plaintiff reported fair compliance with diabetes treatment, with fair tolerance and symptom control. (Tr. 486). She also had continued mild, dull pain from her hernia. *Id.* On examination, Dr. Obri noted similar physical findings as prior visits regarding Plaintiff's abdomen, lumbar spine, feet and toes. (Tr. 490). In July 2014, Plaintiff had "fair compliance" with diabetes treatment and her HbA1c was 7.1%. (Tr. 478); *see also* Tr. 516

In September 2014, Plaintiff saw Robert Baker, D.O., at ProHealth Neurosurgery and Neurology for her low back pain. (Tr. 444-46). Plaintiff stated the pain had started with an injury ten years prior, but had recently worsened. (Tr. 444). She described the pain as radiating to both hips. *Id.* On examination, Dr. Baker noted morbid obesity, a decreased neck range of motion with extension, hyperactive bowel sounds, an umbilical hernia, normal gait, bilateral negative straight leg tests, and a full, painless range of motion in all major muscle groups. (Tr. 446). For Plaintiff's

lumbar radiculopathy, Dr. Baker recommended Plaintiff first address her hernias, then return for "possible myelography." *Id.*

In October, Plaintiff injured her right knee. (Tr. 470). Imaging ordered by Dr. Obri showed moderate degenerative arthritis which had worsened since a prior finding in June 2010, and small joint effusion. (Tr. 521-22). Plaintiff saw Dr. Obri a second time that month for constipation and asthma. (Tr. 468). She had decreased breath sounds. *Id.* Dr. Obri prescribed an inhaler and advised Plaintiff to use a nebulizer. (Tr. 468-69). On examination both times, Dr. Obri continued the same findings regarding Plaintiff's abdomen, spine, and feet/toe sensory examination. (Tr. 468, 475).

In December, Plaintiff returned to Dr. Obri complaining of worsening depression and anxiety. (Tr. 609). Dr. Obri again noted similar physical findings on examination. (Tr. 613). He prescribed medication for Plaintiff's depression and anxiety, and recommended decreasing stress and continuing (or starting) regular exercise. (Tr. 614).

In January 2015, Plaintiff reported her depression had been stable since the last visit. (Tr. 601). She also followed up regarding her diabetes, and Dr. Obri noted she reported fair compliance with treatment, fair tolerance of treatment, and fair symptom control. *Id.* Physical findings remained the same as prior visits. (Tr. 605-06). Plaintiff returned in March for medication refills. (Tr. 585). Dr. Obri recorded the same physical examination findings as in prior visits. (Tr. 589-90). He continued those physical examination findings in April 2015, but also discovered a small black mole on Plaintiff's trunk. (Tr. 582).

In May 2015, Plaintiff underwent surgery to excise a left flank melanoma "with sentinel lymph node biopsy of the left axilla." (Tr. 633-34). Pathology showed malignant melanoma with micrometastasis in one of five lymph nodes. (Tr. 630). Subsequently, Plaintiff underwent a left axillary lymph node dissection in July 2015. (Tr. 655-56).

7

Plaintiff saw Dr. Obri twice in June and once in July 2015 for diabetes follow ups. (Tr. 548-71). At each visit, Dr. Obri noted the same physical examination findings as in prior visits. (Tr. 552-53, 560-61, 569). In June, Dr. Obri noted "poor compliance" with diabetes treatment and Plaintiff's HbA1c was 10.5%. (Tr. 563-64).

In June 2015, Plaintiff also had a single chiropractic visit. (Tr. 616). She reported right lumbar pain. *Id.* After treatment, pain was decreased, muscle spasm decreased, and range of motion increased. *Id.* She was told to return as needed. *Id.*

Plaintiff returned to Dr. Obri in September 2015 to follow up on her diabetes. (Tr. 540). Her compliance with diabetes treatment was "fair" and her HbA1c was 6.7%. (Tr. 539-40). Dr. Obri reported the same physical examination findings as in prior visits related to Plaintiff's abdomen, lumbar spine, and feet/toe sensation. (Tr. 544-45).

In November, Plaintiff returned to discuss weight loss, her hernia, and a cancer spot. (Tr. 709). This visit also involved follow up on mastitis and peripheral neuropathy. *Id.* Plaintiff reported a gait disturbance, recurrent falls, and muscle cramps from her peripheral neuropathy. *Id.* Similar physical examination findings were noted, and Dr. Obri renewed Plaintiff's medication for neuropathy, and advised treatment for mastitis symptoms. (Tr. 714-15). Later that month, Plaintiff returned for a diabetes check. (Tr. 702). Her compliance with treatment was fair, and her HbA1c was 7.9%. *Id.*

*Opinion Evidence*

In May 2014, Dr. Obri completed a Residual Functional Capacity Questionnaire. (Tr. 692-94). Dr. Obri noted he had treated Plaintiff for ten years, her prognosis as fair, and her diagnoses were back pain, diabetes, neuropathy, hypertension, asthma, and depression. (Tr. 692). He opined Plaintiff could sit for one hour at a time, for a total of four hours in an eight-hour workday. *Id.* She

could walk one city block without rest or pain, and could stand/walk for ten minutes at a time, and for a total of one hour in an eight-hour workday. *Id.* She would need a job that permitted shifting positions at will. *Id.* Further, she would need unscheduled half-hour breaks "often". *Id.* However, Dr. Obri also checked a box saying Plaintiff would not need to recline or lie down in excess of typical break time. *Id.* Dr. Obri further opined Plaintiff could occasionally lift ten pounds, and frequently lift less than ten pounds. (Tr. 693). She could use her right arms (reaching), hands (grasping, turning, twisting), and fingers (fine manipulation) for 50 percent of an eight-hour workday, and her left for ten percent. *Id.* He also opined Plaintiff would miss work more than four times per month, was not a malingerer, and was not physically capable of working a full-time job. *Id.*

After an August 2014 consultative physical examination, B.T. Onamusi, M.D., opined Plaintiff could perform the physical requirements of light exertional work. (Tr. 433-42). On examination, Dr. Onamusi found normal muscle power and tone in all muscle groups, but "diminished to absent" ankle and knee reflexes and "patchy areas of inconsistent areas of diminished sensation" in both feet. (Tr. 440). Plaintiff also had diminished vibration sense in her toes. *Id.* She had normal gait, was able to get on and off the examination table, and did not require an assistive device. *Id.* She had difficulty with squatting, which she attributed to pain in her ankles. *Id.* Her grip strength was 40 pounds in both hands, and was able to perform fine coordination and manipulative tasks. *Id.* Dr. Onamusi found Plaintiff had symmetrical spine range of motion with "mild mid thoracic tenderness with no lumbar area tenderness" and no paraspinal muscle spasm. *Id.* She had mild crepitus in her left knee, more than the right, and a normal knee range of motion with no joint tenderness. *Id.*

Later in August 2014, state agency physician Gerald Klyop, M.D. reviewed Plaintiff's records. (Tr. 116-17). Pursuant to Social Security Acquiescence Ruling 98-4, he adopted the RFC of the prior ALJ decision dated March 6, 2012. (Tr. 117). He opined Plaintiff retained the RFC for sedentary work with occasional lifting of ten pounds; frequent lifting of less than ten pounds; standing/walking for two hours in an eight-hour workday; sitting six hours in an eight-hour workday; frequent stair climbing, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders/ropes/scaffolds; and frequently perform fine and gross manipulations. (Tr. 116-17). In January 2015, state agency physician Leslie Green, M.D. reviewed Plaintiff's records and reached the same conclusion as Dr. Klyop. (Tr. 135-37). She noted she was adopting the March 2012 RFC and also noted it required the ability to sit/stand at will. (Tr. 135-37).

In November 2015, Dr. Obri completed a second Physical Assessment Form. (Tr. 696-97). He listed Plaintiff's diagnoses as melanoma, diabetes, neuropathy, depression, hypertension, back pain, and sleep apnea. (Tr. 696). He opined Plaintiff could sit for two hours in an eight-hour workday, and could only stand/walk for ten minutes. (Tr. 696). Plaintiff would need "frequent[]" unscheduled breaks, the duration of each he opined was "unknown". *Id.* Plaintiff could occasionally lift ten pounds, and frequently lift less than ten pounds. *Id.* He opined she could spend zero percent of an eight-hour workday using her hands (grasping, turning, twisting), fingers (fine manipulation), and arms (reaching). *Id.* Finally, he opined Plaintiff would likely miss work more than four times per month. (Tr. 697).

VE Testimony

The VE testified that an individual of Plaintiff's age, education, work experience, and the ALJ's determined RFC could perform work as a surveillance system monitor, button reclaimer, and non-conveyor table worker. (Tr. 65-66).

10

ALJ Decision

In a written decision dated April 15, 2016, the ALJ found Plaintiff had not engaged in substantial gainful activity since her application date. (Tr. 12). Plaintiff had severe impairments of obesity, diabetes mellitus, diabetic neuropathy, right knee degenerative joint disease, degenerative disc disease of L3-S1, carpal tunnel syndrome, asthma, depression, and anxiety; however, none of these impairments—individually or in combination—met or equaled the severity of a listed impairment. (Tr. 12-17). The ALJ then concluded Plaintiff had the residual functional capacity:

> to perform sedentary work as defined in 20 CFR 416.967(a) except: allowance to sit or stand at will (meaning that the claimant sit or stand as needed while working and still perform the duties); no operation of foot controls or stooping greater than 90 degrees; frequent balancing, stooping, handling and fingering; no climbing ladders and the like, kneeling, or crawling; occasional crouching and climbing stairs; occasional overhead reaching with the left upper extremity; and no exposure to obvious hazards. The claimant can also: understand, carry out and remember simple instructions where the pace of productivity is not dictated by an external source over which the claimant has no control such as an assembly line or conveyor belt; make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few and expected changes; respond appropriately to supervision, the general public and coworkers.

(Tr. 18). The ALJ then concluded Plaintiff was unable to perform any past relevant work, but given her age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 24-25). Therefore, the ALJ found Plaintiff was not disabled from her application date through the date of the ALJ's decision. (Tr. 26).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5.     Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff contends the RFC determination lacks the support of substantial evidence because: 1) the ALJ improperly discounted the opinion of treating physician Dr. Obri; and 2) "the ALJ simply guessed at a non-disabling physical residual functional capacity determination, a guess that is not supported by any substantial evidence." (Doc. 13, at 16). The Commissioner responds that the ALJ provided the appropriate consideration and good reasons for discounting Dr. Obri's opinion. Further, the Commissioner contends, the ALJ properly considered the record as a whole in formulating Plaintiff's RFC, and that RFC is supported by substantial evidence. For the reasons discussed below, the undersigned recommends the ALJ's decision be affirmed.

Dr. Obri

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and

13

may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004)).

An ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*May 2014 Opinion*

After summarizing Dr. Obri's May 2014 opinion, the ALJ explained:

. . . . The undersigned does not give controlling weight to the opinion from Dr. Obri since it is not consistent with the objective evidence. The record shows the claimant was only receiving medication refills from her primary care provider. In addition, she was only receiving conservative treatment for back pain. The claimant attended

14

only intermittent and brief chiropractic treatment for back pain (ExC1F; C6F; C19F). As previously mentioned, there was no evidence of significant treatment for hand pain.

Furthermore, the objective clinical findings contained in the treatment record do not support the limitations described by Dr. Obri. A June 2014 examination verified a body mass index over 40, which indicated the claimant was morbidly obese. However, gait was again normal without any limitations in her mobility. She was only advised to lose weight and control her blood sugar levels (ExC13F/31). The following month, a blood test showed HgA1c level of 7.1, which was an improvement from the previous testing (ExC13F/56;C13F). The record establishes that when the claimant is compliant with medical advice, her diabetes remains under control (ExC25F). The claimant testified she had significant pain in her back and knees. However, she acknowledged having no significant treatment for these conditions. The claimant was taking Neurontin for several years, which did resolve her neuropathy (Ex13F). Furthermore, there is no corroborating evidence that she becomes tired from her consistently prescribed medication or that she needs to take a nap every day, as she asserted.

(Tr. 20)

The undersigned finds the ALJ explained her reasoning for declining to give Dr. Obri's opinion controlling weight and provided the required good reasons for discounting that opinion. First, Dr. Obri found Plaintiff would be limited in the use of her hands, *see* Tr. 693, but as the ALJ accurately observed, "there was no evidence of significant treatment for hand pain" (Tr. 20). Although Plaintiff is correct that that Dr. Obri's list of problems included carpal tunnel syndrome as an active problem (Tr. 464, 471, 479, 486, 493, 502, 509, 545, 548, 556, 564, 578, 585, 602, 609, 702, 609), these same records do not show any ongoing complaints of, treatment for, or physical findings regarding hand-related issues. Further, earlier in his decision, the ALJ cited Plaintiff's testimony that she rolled her own cigarettes, which she noted was inconsistent with a contention that her hand pain significantly limited her functioning. (Tr. 19). Plaintiff argues the prior ALJ decision showed she underwent carpal tunnel release. (Doc. 13, at 19) (citing Tr. 90-91). The prior ALJ decision noted:

15

> [T]he claimant underwent carpal tunnel release on the right on October 1, 2010 and was diagnosed with right carpal tunnel syndrome. On October 7, 2010, the claimant was seen in a postoperative visit by Dr. Dajczak and it was noted that motor function was grossly intact. On October 16, 2010, physical therapy was ordered for evaluation and treatment.

(Tr. 90-91). An SSI claimant must establish disability during the pendency of her SSI application. *See* 20 C.F.R. §§ 416.330, 416.335. The relevant time period here is thus May 12, 2014 (the date of Plaintiff's application) through April 15, 2016 (the date of the ALJ's decision). *See* Tr. 10, 217. Plaintiff has pointed to nothing in her post-application treatment record to suggest ongoing treatment for carpal tunnel syndrome. Thus, the ALJ's reasoning on this point is supported by substantial evidence.

Second, the ALJ pointed out that Plaintiff had received only conservative treatment for her back pain. (Tr. 21). Although Dr. Obri consistently noted positive physical examination findings regarding Plaintiff's back (bilateral muscle spasms, restricted and painful flexion, and decreased lordosis), these were frequently noted at visits for other complaints, and at visits during which no treatment was prescribed or suggested for Plaintiff's back. *See generally* Tr. 464-514; 702-15. It was only at two visits in May 2014 where Plaintiff reported back pain as the reason for her visit. (Tr. 493, 501). The ALJ's finding of conservative treatment is supported by the record. The ALJ pointed to Plaintiff's "intermittent and brief chiropractic treatment" (Tr. 20). During the relevant time period, Plaintiff had a single chiropractic visit, at the end of which her pain and muscle spasm decreased and range of motion increased. (Tr. 616). She also had a single visit with similar findings and results just prior to her alleged onset date. *Id.* Each time she was instructed simply to return as needed, suggesting ongoing treatment was not necessary. *See id.* There are also a few records of chiropractic visits in the time preceding Plaintiff's application. *See* Tr. 414-16 (six visits in 2009-early 2010, one visit in 2012, six visits in 2013). Additionally, although Plaintiff underwent an

16

initial assessment with Dr. Baker for her back pain (Tr. 444-46), there were no further records from this physician. Further, as the ALJ noted later with regard to Plaintiff's back pain: "She was not receiving any pain management treatment or taking any narcotic medication and none was recommended." (Tr. 21). At the May 2014 visits where Plaintiff complained of back pain, Dr. Obri prescribed Ibuprofen, and recommended physical therapy as well as heat and ice treatment. (Tr. 499, 508). And, though imaging showed disc narrowing in Plaintiff's lumbar spine (Tr. 458), she had no further treatment other than the single June 2015 chiropractic visit (Tr. 616). Such conservative treatment for Plaintiff's back issues supports the ALJ's decision that such issues were not disabling and is a good reason for discounting Dr. Obri's highly restrictive opinion. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) ("The ALJ noted that the records indicate Kepke received only conservative treatment for her ailments, a fact which constitutes a 'good reason' for discounting a treating source opinion"); *Lester v. Comm'r of Soc. Sec.*, 596 F. App'x 387, 389 (6th Cir. 2015) (finding ALJ reasonably discounted a doctor's proposed limitations because, among other things, the claimant received conservative treatment); *Francis*, 414 F. App'x at 806 ("the ALJ reasonably viewed Francis's limited treatment as inconsistent with Dr. Wakham's opinion"); *see also* 20 C.F.R. § 416.927(c)(2)(ii) ("We will look at the treatment the source has provided .... ").

Third, the ALJ noted generally that Dr. Obri's restrictions were "not consistent with the objective evidence." (Tr. 20). In the next paragraph, the ALJ explained Plaintiff had a continued normal gait with no limitations in mobility in a June 2014 examination (the month following Dr. Obri's opinion), and that her diabetes remained under better control when she remained compliant with medication. *Id.* (citing Tr. 490). This was supported by the record. *Compare* Tr. 539-40, 478, 700-02 (lower HbA1c levels when "fair compliance" with treatment noted), *with* Tr. 509, 563-64

(higher HbA1c levels noted when "poor compliance" with treatment noted); *see also generally* Tr. 464-514; 702-15 (consistent notations of normal gait and no mobility limitations). This was thus a supported reason to discount Dr. Obri's more restrictive opinion.

Finally, Plaintiff objects to the ALJ's statement that she "was only receiving medication refills from her primary care provider." (Tr. 20). Although the undersigned agrees this wording is inartful, as Dr. Obri provided ongoing treatment to Plaintiff for a variety of complaints, taken as a whole, the ALJ's reasons for discounting Dr. Obri's more restrictive RFC are supported by the record. This is not to say Dr. Obri only provided medication refills, he did more. For example, he ordered imaging of Plaintiff's back, pelvis, and knee (Tr. 458, 497-98, 521-22), repeatedly recommended exercise, diet, and smoking cessation (Tr. 475-76, 490-91, 507-08, 513-14, 544-45, 553-54, 570-71, 583, 590, 606-08, 614), and discovered a cancerous mole on Plaintiff's flank (Tr. 582). However, Dr. Obri's treatment of Plaintiff predominantly consisted of prescribing and refilling medications. *See* Tr. 469, 475-76, 490-91, 507-08, 513, 544-45, 553-54, 561, 570-71, 583, 590, 606-08, 614, and 714. This, again, is conservative treatment inconsistent with Dr. Obri's opinion of complete disability.

Taken as a whole, the undersigned finds the ALJ provided the required good reasons for discounting Dr. Obri's May 2014 opinion.

*November 2015 Opinion*

The ALJ also summarized Dr. Obri's November 2015 opinion and then ascribed it "little weight" because it was "not consistent with the clinical findings in the record, even by Dr. Obri's own treatment notes." (Tr. 22). In between the ALJ's discussion of Dr. Obri's May 2014 opinion and November 2015 opinion, she discussed the August 2014 consultative examination with Dr. Onamusi in which Dr. Onamusi opined Plaintiff had the functional capacity to perform light work.

18

(Tr. 20-21) (citing Tr. 433-42). In that examination, Dr. Onamusi found, among other things, that Plaintiff had a normal gait, was able to get on and off the examination table, had 40 pounds of grip strength, and was able to perform a variety of fine coordination and manipulative tasks ("tie knots, do buttons, do shoelaces, pick up coins, hold pens, turn door handles, pull zippers, and do fine fingering movements" (Tr. 440)). The ALJ also discussed Plaintiff's ongoing conservative back pain treatment consisting of one September 2014 visit to a neurosurgeon (Tr. 21) (citing Tr. 444-46), and one chiropractic visit in June 2015 (Tr. 22) (citing Tr. 616). At the neurosurgeon visit, Plaintiff had a normal gait, grossly normal muscle tone and strength, a full, painless range of motion in all major muscle groups and joints, negative straight leg raising tests, and normal sensation. (Tr. 446). These records support the ALJ's conclusion that Dr. Obri's November 2015 opinion (in which he opined Plaintiff could only sit for two hours in an eight-hour workday, stand for ten minutes, and never use her arms, hands, or fingers during an eight-hour workday) was "not consistent with the clinical findings contained in the record". (Tr. 22).

The ALJ's analysis of Dr. Obri's opinions touches on the required regulatory factors of consistency, supportability, and nature of treatment relationship. *See* 20 C.F.R. § 404.1527(d)(2)); *see also, e.g., Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (finding good reasons satisfied when treating physicians "proposed limitations were inconsistent with his own treatment notes from the relevant period, which generally showed that [the plaintiff] was receiving conservative treatment and that he was not suffering from disabling impairments."). The ALJ's provided reasons are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Ealy,* 594 F.3d at 514. As such, the ALJ's consideration of Dr. Obri's opinions should be affirmed.

<u>Residual Functional Capacity</u>

RFC is defined as "the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. § 416.927(e)(1)(i). However, it must be supported by substantial evidence. In formulating the RFC, the ALJ is not required to adopt any physician's opinion verbatim. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."). As the Sixth Circuit recently explained:

> Shepard also argues that the ALJ's RFC lacks substantial evidence because no physician opined that Shepard was capable of light work. But "the *ALJ is charged* with the responsibility of determining the RFC based on *her* evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (emphasis added). An RFC is an "administrative finding," and the final responsibility for determining an individual's RFC is reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at * 1–2 (July, 2, 1996). "[T]o require the ALJ to base her RFC on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability." *Rudd*, 531 F. App'x at 728.

*Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017); *see also Mokbel-Aljahmi v. Comm'r*, -- F. App'x --, 2018 WL 2017564, at *5 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ . . . . We similarly find no error here. The ALJ undertook a laborious evaluation of the medical record when determining the residual functional capacity, and substantial evidence supports the ALJ's conclusions.") (rejecting the argument that "once the ALJ decided to give no weight to the

physicians' opinions regarding his ability to work, the ALJ was required to get the opinion of another physician before setting the residual functional capacity").

Here, in formulating the RFC, the ALJ thoroughly reviewed the medical evidence of record, Plaintiff's testimony, and the opinion evidence. *See* Tr. 18-24. As noted above, the ALJ's evaluation of treating physician Dr. Obri's opinions is supported by substantial evidence. The ALJ also considered the opinions of consultative examiner Dr. Onamusi (assigning it "little weight" because it did not account for additional limitations due to obesity and the use of hands and feet due to neuropathy (Tr. 21)) and state agency reviewing physicians Drs. Klyop and Green (giving them "some weight" but finding Plaintiff further limited in the use of her feet due to neuropathy (Tr. 22)). *See Creech v. Comm'r of Soc. Sec.*, 581 F. App'x 519, 522 (6th Cir. 2014) (finding no error in ALJ's "concur[ence with] [state agency physician] conclusion that the claimant is 'not disabled'" even where those physicians concluded the claimant was less limited than the ALJ ultimately determined). The ALJ also properly evaluated Plaintiff's testimony, finding it demonstrated inconsistencies with allegations of total disability. (Tr. 22) ("Despite her symptoms, the claimant admitted that she was able to sit to watch television and movies during the day, and prepare meals. In addition, she would drive to appointments and frequently go to the library to use the computers.") (citing Tr. 56-57 (hearing testimony), Tr. 263-71 (function report)).

The RFC here differed from the prior ALJ's determination—and thus from the opinions of state agency physicians Klyop and Green—in that it added "no operation of foot controls or stooping greater than 90 degrees"; "occasional" (rather than frequent) "crouching and climbing stairs"; "occasional overhead reaching with the left upper extremity"; "no exposure to hazards"; and restrictions in pace and productivity, and mental limitations. *Compare* Tr. 18 *with* Tr. 88.

Plaintiff argues it was error to impose such additional limitations without obtaining additional medical opinion to support such limitations. (Doc. 13, at 21-23). She relies on *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio) and subsequent cases following *Deskin*. *Deskin* explained that "as a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining Agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Id.* Further, the court explained, "the ALJ may not interpret raw medical data in functional terms." *Id.* However, *Deskin* also provided that "[a] medical source may not be necessary in every case", *id.*, and other courts have noted *Deskin* has been "criticized by other judges within this District", *Adams v. Colvin*, 2015 WL 4661512, at *15 (N.D. Ohio). Specifically, in *Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222 at *2 (N.D. Ohio), the court found that "Deskin . . . is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." In so holding, the court relied upon the statutes requiring an ALJ—not a physician—to determine a claimant's RFC based on the evidence as a whole. *Id.* (citing 20 C.F.R. §§ 416.946(c), 416.927(e)(2); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96–5p, 1996 WL 374183, SSR 96–8p, 1996 WL 374184).

Given the Sixth Circuit's recent pronouncements noted above, *see Shepard*, 705 F. App'x at 442-43; *Mokbel-Aljahmi*, -- F. App'x --, 2018 WL 2017564, at *5, the undersigned finds no error in the ALJ modifying the RFC without medical opinion evidence regarding each specific restriction. Contrary to Plaintiff's argument that the ALJ "simply guessed" at an RFC, the undersigned finds ALJ appropriately reviewed the record, explained the basis her RFC determination, and that determination is supported by substantial evidence. The RFC was largely

22

consistent with the opinions of Drs. Klyop and Green—to whom the ALJ assigned some weight—but was *more* limited to account for "the claimant's body weight, back and knee pain", "fluctuating blood sugar levels, neuropathy and pain[] in her feet and hands and shortness of breath". (Tr. 24). Moreover, the ALJ explained she gave little weight to Dr. Onamusi's consultative examination opinion finding Plaintiff could perform the requirements of light work, because it did not "account for the claimant's limitations due to obesity or the limitations with the use of her hands and feet due to neuropathy, whereas the assessed residual functional capacity is for a limited range of sedentary work and better accommodates all of the claimant's impairments." (Tr. 21). Thus, she explained, Dr. Onamusi's opinion was not limited enough to account for Plaintiff's abilities.

Notably, Plaintiff herself testified her feet were numb most of the time (Tr. 46), supporting the ALJ's determination that she should not use foot controls. And she testified to overhead reaching problems with her left arm (Tr. 51), supporting the ALJ's limitation to only occasional overhead reaching with that arm. Further, the ALJ acknowledged Plaintiff's "back and knee pain" as a reason for further restricting the RFC (Tr. 24), which is again supported by Plaintiff's testimony, *see* Tr. 47. This is not a case where the ALJ reviewed raw medical data without any opinion evidence and formulated an RFC. Rather, the ALJ relied upon the treatment evidence, medical opinion evidence, and subjective reports of symptoms in formulating an RFC. This is precisely what the regulation requires her to do. *See* 20 C.F.R. §§ 416.927(e)(2)(i), 416.945(a)(3); SSR 96-5p, 1996 WL 374183, at *5 (RFC is "based upon consideration of all relevant evidence in the case record.").

The undersigned finds the RFC supported by substantial evidence. The undersigned therefore recommends the ALJ's determination in this regard be affirmed.

Vocational Expert

Plaintiff's remaining argument is that the ALJ erred by relying on the hypothetical question which mimicked the inaccurate RFC determination. (Doc. 13, at 20-21). But, because the RFC was supported by substantial evidence, Plaintiff's argument predicated on a flawed RFC must fail. Stated differently, the Commissioner met her burden at the fifth step by relying on VE testimony in response to a hypothetical question which accurately portrayed Plaintiff's limitations. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987); *Ealy*, 594 F.3d at 516-17. Therefore, Plaintiff's argument related to Step Five is not well-taken.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and recommends the decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).